UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) NO. 25-CR-10037-RGS |
| | ) |
| DAVID SMERLING | ) |

**DEFENDANT'S SENTENCING MEMORANDUM**

Although David Smerling is now a 75-year-old man, his life has been haunted by the verbal, psychological, and physical abuse he suffered in his early life. The violence and torment he experienced led to a never-ending search for the love and approval he lacked as a child. His perpetual search for affection and approval took him down paths where he sought connection wherever he could find it, at significant financial and emotional costs. He recognizes, however, that those financial and emotional costs pale in comparison to the losses suffered by his victims. Especially painful to him is the fact that his actions do not reflect the values he has tried to live by in the community or the role he wishes to play in his family's life. That is something he must live with every day for the rest of his life, and for which he deeply aspires to atone.

As evidence of the seriousness with which he took the allegations in this case and his intention to take unequivocal responsibility for his crimes, Mr. Smerling pled guilty pursuant to a binding plea agreement to a seven-count information including charges of Wire Fraud (18 U.S.C. § 1343); Money Laundering (18 U.S.C. § 1956(a)(1)(b)(i)) and Aggravated Identity Theft (18 U.S.C. §§ 1028A(a)(1) and 3147. We submit that a sentence of <u>87 months of imprisonment,</u> followed by 36 months of supervised release, will afford adequate deterrence and just punishment in this case and considers both Mr. Smerling's personal history and life circumstances. Guided by the principles and purposes of sentencing set forth at 18 U.S.C. §

3553(a)(2), we further submit that an 87-month sentence is "sufficient, but not greater than necessary" to serve the purposes of sentencing set forth at 18 U.S.C. § 3553(a)(2). *United States v. Kimbrough*, 552 U.S. 85 (2007); *United States v. Booker*, 534 U.S. 220 (2005); *United States v. Martin*, 520 F.3d 87 (1st Cir. 2008); *United States v. Rodriguez*, 527 F.3d 221 (1st Cir. 2008).

### I. HISTORY AND CHARACTERISTICS OF DAVID SMERLING

*Early Life and Adolescence*

Mr. Smerling grew up in an astonishingly abusive home. His father, Herman, was profoundly and profanely verbally abusive: not in the form of neglect or minor comments, but outright insults and degradation, vile remarks that should never be uttered to children or adults. Mr. Smerling felt small and insignificant in his father's eyes, and this negative sense of self continued throughout his childhood into his young adulthood. Even now, as a senior citizen, he can still hear the echoes of his father's disgust.

While Mr. Smerling's father was verbally abusive, Mr. Smerling's mother subjected him to unending physical abuse. Disturbingly resourceful in her attacks, Marcia Smerling assaulted her son with pans, high heels, hangers – essentially whatever she found nearby when she flew off the handle. She dumped plates of food over his head if he didn't finish his meal. She beat him mercilessly; he remembers her beating him in the hallway at school, while the other students continued studying as if nothing was happening outside the door. Exhibit 1, Aid in Sentencing Memorandum, Kristin Dame. She was diagnosed later in life with bipolar disorder, a condition for which she was medicated for a period of time, and although the diagnosis explained her mercurial and abusive treatment of her son, he had by then endured years of abuse that fundamentally shaped his psyche and low self-worth.

*Marriage and Family*

It was not until after Mr. Smerling was well into adulthood that he understood that the abuse he suffered as a child was neither normal nor deserved. In marrying his wife, Abbe, he finally felt not only the real love and support that was absent from his early years, but the promise of a better family life. He rightly describes Abbe as the one who put him on the right path. She made him realize he had value and could achieve his goals. With her support and love, he graduated from Adelphi University and achieved his dream of attending and graduating law school at New York University School of Law.

In 1971 David and Abbe Smerling got married. They went on to have a family - they initially struggled to have children and were overjoyed at the birth of each of their daughters, Rebecca, Melissa, and Jessica. Each has gone on to find their own careers and have their own families. Nevertheless, the Smerling clan is a close-knit one – Rebecca and her family live with Abbe, and Jessica and Melissa each live within 20 minutes of the family home. Together they share weekly family dinners.

Indeed, there is no greater evidence of Smerling's desire and commitment to build a life and family, in stark contrast to the tumult and abuse that characterized his early life, than the ways in which he shows up for his family. *Id*. He took care of three of his grandchildren while Rebecca and her husband worked, and he deeply appreciated the bond he held with his children, their spouses, and his grandchildren. As Rebecca describes him, her father was a "primary support…really present in my children's lives. He goes to their sporting events and dance recitals…he drove them to school and picked them up." *Id.*  When it came time for his eldest daughter to have her Bat Mitzvah, he dedicated himself to tutoring her. As Rebecca Smerling explains, "When my daughter, who is dyslexic, was preparing for her bat mitzvah, he spent

3

countless hours helping her with Hebrew, working carefully and lovingly to ensure she not only learned her portion but understood its meaning." Exhibit 2, Letter of Support, Rebecca Smerling.

His daughter Jessica writes that "Grandpa David" was as strong a presence in the lives of her children: "At my son's 2nd birthday party, he was the entertainment— singing preschool songs to all the small children, keeping them all so engaged." Exhibit 3, Letter of Support, Jessica Smerling.

All his children talk about his enduring love for his family. His daughter Jessica explains "His love wasn't just something he said—it was something he showed through his actions, big and small. Whether it was helping me with school, or simply being there when I needed guidance, he consistently demonstrated his commitment to his family." *Id.*

*Faith and Commitment to his Community*

His commitment to being there for his friends and community has always been just as strong and devoted: he "was the one who family and friends of family sought when they needed advice or help, from a simple question about work to a computer repair in the middle of the night." Exhibit 1. He has also always shown a deep dedication to his faith and to his religious community. For over two decades Mr. Smerling's family has been a member of Temple Isaiah in Lexington, MA. He is a dedicated member of the congregation, as Rabbi Howard Jaffe writes: "It would not be an overstatement to say that I would be hard-pressed to think of another member of our congregation who was more present for whatever was needed at any time, and who served the community more thoroughly and consistently than did David." Exhibit 4, Letter of Support, Rabbi Howard Jaffe. Rabbi David Wolfman writes of Mr. Smerling's service to the community, "David was always willing to volunteer during Shabbat or Holiday Services with his guitar and, more significantly and importantly, he volunteered to lead Shiva Services (Mourning

4

Services) in people's homes who are in mourning." Exhibit 5, Letter of Support, Rabbi David Wolfman.

Over the past 20 years he has worked at various synagogues, including Temple Isaiah in Lexington, Congregation Shalom in Chelmsford, and Congregation B'nei Torah in Canton. As Abbe Smerling's cousin, Warren Lada, explains, "David is well known in Lexington and the Jewish community, with a very large circle of friends. He has volunteered his time singing in religious services and special occasions like weddings and Bar and Bat Mitzvahs." Exhibit 6, Letter of Support, Warren Lada. His commitment to his faith and religious community will be judged alongside and against his offenses, it is nonetheless a positive aspect of his character and history that this court should consider in fashioning a just sentence.

*Medical and Mental Health History*



██████████

## II.     NATURE AND CIRCUMSTANCES OF OFFENSES

Mr. Smerling wishes to communicate his profound remorse, absolute shame, and regret for his actions. That the majority of the charged offenses occurred some years ago does little to nothing to ameliorate the general and specific harms of his conduct. He recognizes that although there may be clear monetary amounts attached to the wreckage he caused, the harms of his offenses are difficult to quantify, his conduct was reprehensible. Mr. Smerling is firmly aware of the fact that he has betrayed his victims, because they trusted him and he put his own needs ahead of that trust. He took from them – their money and their sense of security. He is using this time to put in the work to change his ways of thinking, and to mend the bonds he has broken.

*Use of Victim Funds: In Pursuit of Connection*

Mr. Smerling ultimately betrayed his victims — and his family — through his actions and breach of their trust. It is important to understand, however, that he did this in the pursuit of connection and companionship. As a result of the mental neglect and emotional abuse he suffered in his early years and adolescence, he developed a bottomless well of need for outside approval. Exhibit 1. Mr. Smerling's desperation for love and intimacy, and for acceptance of the women he met, snowballed out of control. They showed him unpaid bills and late invoices, pictures of broken-down vehicles and their children, and in return he sent them money. He flew them away from their abusive relationships and invested in their business propositions. Exhibit 1. In exchange, they provided him with affirmations and emotional availability. Though he had stopped seeing them in person many years earlier, he kept sending them money. As the bank records provided by the government reflect, this continued well after his arrest in this case.

Ultimately, Mr. Smerling sent more than $1.5 million dollars to these woman – notably $914,405 to just one woman. The amount of money they were able to ascertain from him is astounding and demonstrates not just the utter wrongfulness of his actions, but his desperation for affection and attention.

This behavior demonstrates how akin to an addiction his need had become; he continued to engage in behavior that was harmful, despite negative consequences. He had a compulsion and inability to stop. Nevertheless, over the past few months in custody, and having met several times with a social worker to discuss his offenses and history, Mr. Smerling realizes that his behavior was utterly out-of-control, and that it led to an abuse of trust of his roles in his victims' lives.  Mr. Smerling offers this information only to provide context to his behavior and understands it in no way excuses his actions.

### III.   GUIDELINE RANGE

The guideline range found by the probation department in this case is 159-192 months (135-168 months, with 24 months consecutive on Count 7).

With the Supreme Court decisions in *Booker, Gall v. United States,* 552 U.S. 38 (2007), and *Kimbrough*, federal sentencing has undergone dramatic changes, and the sentencing options available to district courts have significantly broadened. *See, e.g., United States v. Taylor,* 532 F.3d 68, 69 (1st Cir. 2008). Of course, the Guidelines do remain the starting point and the initial benchmark. However, as the First Circuit stressed, the Supreme Court ruling in *Kimbrough* requires a "more holistic inquiry" and that "section 3553(a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs the thread of an overarching principle." *United States v. Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008).  That overarching principle is to "impose a sentence sufficient but not greater than necessary." *Id*. In

7

reaching a decision on what constitutes an appropriate sentence, the district court should "consider all the relevant factors" and "construct a sentence that is *minimally sufficient* to achieve the broad goals of sentencing." *Id.* (emphasis added).

*Fraud Guideline*

While we have no formal objection to the application and calculation of the guidelines in this case, we do note that Courts have often recognized that the financial guideline is crude and frequently ill-fitting. *See e.g., United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) (noting that "the Sentencing Guidelines for white-collar crimes [can produce] a black stain on common sense"); *United States v. Watt*, 707 F.Supp.2d 149, 154 fn 9 (D. Mass. 2010) (quoting *Parris*: "Although I began the sentencing proceeding 'by correctly calculating the applicable Guidelines range,' ... it is difficult for a sentencing judge to place much stock in a guideline range that does not provide much realistic guidance.").

Legal scholars have argued and advised for reforms to the sentencing guidelines for economic crimes, particularly to the loss table and corresponding enhancements. See, "How the Economic Loss Guideline Lost its Way, and How to Save It", B. Boss, K. Kapp, Ohio State Journal of Criminal Law, Volume 18, Number 2. (noting that the economic crimes guidelines "routinely recommends arbitrary, disproportionate, and often draconian sentences to first time offenders of economic crimes.")  see "At a Loss for Justice: Federal Sentencing for Economic Offenses" A. Ellis, M. Allenbaugh, Criminal Justice, Volume 25, Number 4, Winter 2011. Finally, the United States Sentencing Commission has included it in its priorities for the amendment cycle ending May of 2026 an examination of U.S.S.G. § 2B1.1.[1]

---

[1] United States Sentencing Commission, Final Priorities for Amendment Cycle (2025), available at https://www.ussc.gov/policymaking/federal-register-notices/federal-register-notice-final-2025-2026-priorities.

### IV. AN 87-MONTH SENTENCE IS SUFFICIENT BUT NOT MORE THAN NECESSARY TO ACHIEVE THE GOALS OF SENTENCING.

An 87-month sentence of imprisonment considers the framework of the Sentencing Guidelines, is sufficient to promote respect for the law, and serves the purposes of punishment, rehabilitation, and deterrence, while recognizing the individual circumstances of Mr. Smerling and his offenses. Importantly, "[s]entencing courts are not required [..] to 'afford each section of the section 3553(a) factors equal prominence. The relative weight of each factor will vary with the idiosyncratic circumstances of each case, and the sentencing court is free to adapt the calculus accordingly.'" *United States v. Vinas*, 106 F.4th 147, 154 (1st Cir. 2024), quoting *United States v. Rivera-Rodríguez*, 75 F.4th 1, 30 (1st Cir. 2023).

The 3553(a) factors here support a sentence that advances rehabilitation as a primary sentencing goal and considers Mr. Smerling's mitigating personal history, his age and need for medical treatment, his reduced risk of recidivism and specific deterrence, and the need to pay restitution.

*<u>Mr. Smerling's Medical and Mental Health Conditions and the Effects of Aging in Prison Militate in Favor of an 87-Month Sentence</u>*

Mr. Smerling's binding sentence range of 87 – 108 months ensures that he will be imprisoned until he is at least 82 years old, and potentially 84 years old should the high end of the range be imposed. Whatever sentence the Court imposes, Mr. Smerling will continue to grow old in the BOP. He faces the very real prospect of dying in prison. The BOP has long been ill-equipped to care for elderly inmates and the associated medical conditions they present. Prison medical departments are chronically understaffed[2] thereby compromising their ability to provide

---

[2] The Office of Inspector General found that "recruitment of medical professionals is one of the BOP's greatest challenges and staffing shortages limit inmate access to medical care, result in an increased need to send inmates outside the institution for medical care, and contribute to increases in medical costs." U.S. Dept. of Justice, Office of

adequate medical care.[3] Prison is a dire setting for all incarcerated individuals, but it is particularly threatening for older adults: the experience of prison itself is often "exactly the opposite of what is considered 'age-friendly care.'"[4]

Undoubtedly, prison will have drastic negative impacts on Mr. Smerling's physical and mental health. Social science literature is clear that prison detrimentally effects the physical and mental well-being of older adults. Aging inmates (those over age 55) suffer a "decline in physical and cognitive abilities."[5] Research shows that incarcerated older adults suffer from the phenomenon of "accelerated aging", the process in which incarceration speeds up biological aging.[6] For Mr. Smerling, already 75 years old, and already suffering from physical and mental health issues, prison will undoubtedly cause further and more pain and distress. What's more, a lengthier sentence would run counter to the directive set forth at 18 U.S.C. § 3553(a)(2)(D), which requires the court to consider a defendant's need for medical care when fashioning a just sentence.

## V. CONCLUSION

Mr. Smerling is asking for a sentence of 87 months incarceration, with 36 months supervised release to follow. This is consistent with the binding plea agreement between the parties, and we believe it is appropriate for the reasons discussed above.

---

the Inspector General, Review of the Federal Bureau of Prisons' Medical Staffing Challenges at i (2016), https://oig.justice.gov/reports/2016/e1602.pdf.

[3] The DOJ OIG identified several serious issues at FMC Devens. Notably, substantial shortages of healthcare employees and Correctional Officers—which is an issue at many BOP institutions but particularly problematic for a medical institution—have created widespread and troubling operational challenges at FMC Devens that substantially affect the health, welfare, and safety of employees and inmates. U.S. Dept. of Justice, Office of the Inspector General, DOJ OIG Releases an Inspection of the BOP's Federal Medical Center Devens at 1 (Dec. 11, 2024), available at https://primarynewssource.org/wp-content/uploads/12-11-2024.pdf.

[4] Farah Acher Kaiksow et al., *Caring for the Rapidly Aging Incarcerated Population: The Role of Policy*, 49 J Gerontol Nurs., Apr. 25, 2023, at 5.

[5] Shawna Wolfe, *Aging in Correctional Facilities: Challenges, Programs, and Service Adaptions*, 7 PURE Insights, 2018, at 1.

[6] Kaiksow, *supra*, at 1.

                                        Respectfully submitted,

                                        DAVID SMERLING

                                        By his attorney,

                                        */s/ Eliza Jimenez*
                                        Eliza Jimenez
                                        NY Bar# 5108469
                                        Federal Defender Office
                                        51 Sleeper Street, 5th Floor
                                        Boston, MA  02210
                                        Tel: 617-223-8061

                                   <u>CERTIFICATE OF SERVICE</u>

      I, Eliza Jimenez, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on October 3, 2025.

                                        */s/ Eliza Jimenez*
                                        Eliza Jimenez